**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

JOANNE G.,[1]               ) Case No. EDCV 18-0997-JPR
                           )
            Plaintiff,     )
                           ) **MEMORANDUM DECISION AND ORDER**
        v.                 ) **REVERSING COMMISSIONER**
                           )
NANCY A. BERRYHILL, Acting )
Commissioner of Social     )
Security,                  )
                           )
            Defendant.     )
_____)

**I.   PROCEEDINGS**

Plaintiff seeks review of the Commissioner's final decision denying her application for Social Security disability income benefits ("DIB").  The parties consented to the jurisdiction of the undersigned under 28 U.S.C. § 636(c).  The matter is before the Court on the parties' Joint Stipulation, filed March 6, 2019, which the Court has taken under submission without oral argument. For the reasons stated below, the Commissioner's decision is reversed and this action is remanded for further proceedings.

_____

[1] Plaintiff's name is partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

1

## II. BACKGROUND

Plaintiff was born in 1980. (Administrative Record ("AR") 46, 175.) She completed two years of college. (AR 196.) She last worked as a medical assistant and was a sales associate and loader before that. (AR 233.)

On May 28, 2014, Plaintiff applied for DIB, alleging that she had been unable to work since January 8, 2014, because of issues with her right shoulder, left knee, lower back, and left hip. (AR 63, 175-78.) After her application was denied initially (AR 83-84, 106-09) and on reconsideration (AR 104, 112-16), she requested a hearing before an Administrative Law Judge (AR 117-18). A hearing was held on January 10, 2017, at which Plaintiff, who was not represented by counsel, testified, as did a vocational expert. (AR 44-61.) In a written decision issued January 19, 2017, the ALJ found Plaintiff not disabled. (AR 24-38.) With the assistance of counsel, she sought Appeals Council review (AR 269-72), which was denied on April 2, 2018 (AR 1-6). This action followed.

## III. STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. See Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007). Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion. Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007). It

is more than a scintilla but less than a preponderance. Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)). "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019). To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for the Commissioner's. Id. at 720-21.

**IV.  THE EVALUATION OF DISABILITY**

People are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or has lasted, or is expected to last, for a continuous period of at least 12 months. 42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

A.   The Five-Step Evaluation Process

The ALJ follows a five-step evaluation process to assess whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4); Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996). In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled

and the claim must be denied. § 404.1520(a)(4)(i).

If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, the claimant is not disabled and her claim must be denied. § 404.1520(a)(4)(ii).

If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments set forth at 20 C.F.R. part 404, subpart P, appendix 1; if so, disability is conclusively presumed. § 404.1520(a)(4)(iii).

If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[2] to perform her past work; if so, she is not disabled and the claim must be denied. § 404.1520(a)(4)(iv). The claimant has the burden of proving she is unable to perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets that burden, a prima facie case of disability is established. Id. If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not

---

[2] RFC is what a claimant can do despite existing exertional and nonexertional limitations. § 404.1545; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989). The Commissioner assesses the claimant's RFC between steps three and four. Laborin v. Berryhill, 867 F.3d 1151, 1153 (9th Cir. 2017) (citing § 416.920(a)(4)).

4

disabled because she can perform other substantial gainful work available in the national economy.  § 404.1520(a)(4)(v); <u>Drouin</u>, 966 F.2d at 1257.  That determination comprises the fifth and final step in the sequential analysis.  § 404.1520(a)(4)(v); <u>Lester</u>, 81 F.3d at 828 n.5; <u>Drouin</u>, 966 F.2d at 1257.

B.    <u>The ALJ's Application of the Five-Step Process</u>

At step one, the ALJ found that Plaintiff last met the insured status requirements of the Social Security Act on December 31, 2015, and had not engaged in substantial gainful activity since January 8, 2014, the alleged onset date.[3]  (AR 26.)  At step two, he concluded that through the date last insured Plaintiff had severe impairments of

> status post right shoulder arthroscopic rotator cuff and glenohumeral joint debridement with rotator cuff repair, right shoulder sprain with impingement, status post left knee    arthroscopic    m[e]niscectomy,    status    post arthroscopic meniscectomy, lumbosacral strain/sprain, status post left hip arthroscopic surgery, right knee sprain, cervical degenerative disc disease, lumbar degenerative disc disease, major depressive disorder and obesity.

(<u>Id.</u>)  At step three, he determined that Plaintiff's impairments did not meet or equal a listing.  (AR 27-28.)  At step four, he found that Plaintiff's RFC allowed her to

---

[3] The record contains some conflicting evidence of when Plaintiff last worked (<u>see, e.g.</u>, AR 727, 730 (Plaintiff indicating that she was working on "modified" basis on Apr. 30, 2014), but she stated many times that she last worked January 8, 2014 (<u>see, e.g.</u>, AR 884), and the ALJ apparently determined that any work after that date was not substantial gainful activity.

lift and/or carry ten pounds occasionally, less than ten
pounds frequently; . . . stand or walk for two hours out
of an eight-hour workday with normal breaks and the use
of a cane; . . . sit for six hours out of an eight-hour
workday with normal breaks; . . . occasionally perform
postural activities; . . . cannot climb ladders, ropes or
scaffolds or crawl; . . . must avoid unprotected heights
and moving machinery; . . . can frequently reach,
including reaching overhead bilaterally; . . . frequently
handle, finger, feel, push or pull with the upper
extremities bilaterally; . . . frequently operate foot
controls with the right lower extremity and occasionally
operate foot controls with the left lower extremity; the
claimant is limited to simple routine tasks [and] object
oriented tasks; the claimant can frequently interact with
coworkers, supervisors and the public; the claimant
cannot perform inherently stressful tasks such as taking
complaints.

(AR 28.) The ALJ found that Plaintiff could not do any past
relevant work. (AR 36.) But at step five, he determined that
given her age, education, work experience, and RFC, she could
perform two representative jobs in the national economy. (AR
37.) Thus, he found Plaintiff not disabled. (AR 38.)

**V. DISCUSSION**[4]

Plaintiff argues that the ALJ erred by improperly finding that she could perform alternative work and discounting her subjective pain testimony and statements. (See J. Stip. at 5.) As discussed below, remand is necessary based on the ALJ's improper discounting of her subjective statements. Because Defendant concedes that the ALJ erred in identifying alternative work but argues that the error was harmless (see id. at 10-12), the ALJ on remand can simply revisit and correct the analysis and record.[5] Accordingly, the Court does not reach that issue.

A. The ALJ Did Not Properly Evaluate Plaintiff's Subjective Symptom Testimony

As Plaintiff acknowledges, the ALJ cited her "routine and conservative care" (id. at 15) and daily activities (id. at 17-19) in addition to providing a "general discussion of the medical evidence" (id. at 15) to support partially discounting her subjective symptom testimony and statements (see generally AR 31-

---

[4] In Lucia v. SEC, 138 S. Ct. 2044, 2055 (2018), the Supreme Court recently held that ALJs of the Securities and Exchange Commission are "Officers of the United States" and thus subject to the Appointments Clause. To the extent Lucia applies to Social Security ALJs, Plaintiff has forfeited the issue by failing to raise it during her administrative proceedings. (See AR 44-61, 269-72); Meanel v. Apfel, 172 F.3d 1111, 1115 (9th Cir. 1999) (as amended) (plaintiff forfeits issues not raised before ALJ or Appeals Council); see also generally Kabani & Co. v. SEC, 733 F. App'x 918, 919 (9th Cir. 2018) (rejecting Lucia challenge because plaintiff did not raise it during administrative proceedings), pet. for cert. filed, __ U.S.L.W. __ (U.S. Feb. 22, 2019) (No. 18-1117).

[5] Defendant also argues that the claim has been forfeited because Plaintiff did not raise it during her administrative proceedings. (J. Stip. at 12.) But because Plaintiff was not represented by counsel before the ALJ and remand is in any event required, the Court declines to invoke forfeiture.

36). But, as explained below, substantial evidence did not support his finding that her treatment was conservative or that her daily activities were "compatible with competitive work" (AR 36), and inconsistency with objective evidence alone is an insufficient reason to discount subjective pain testimony. Thus, remand is necessary.

### 1. Applicable law

An ALJ's assessment of a claimant's allegations concerning the severity of her symptoms is entitled to "great weight." Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989) (as amended) (citation omitted); Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1985) (as amended Feb. 24, 1986). "[T]he ALJ is not required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)." Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (citing Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989)).

In evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis. See Lingenfelter, 504 F.3d at 1035-36; see also SSR 16-3p, 2016 WL 1119029, at *3 (Mar. 16, 2016).[6] "First, the ALJ must determine whether the claimant has

---

[6] The Commissioner applies SSR 16-3p to all "determinations and decisions on or after March 28, 2016." Soc. Sec. Admin., Policy Interpretation Ruling, SSR 16-3p n.27, https://www.ssa.gov/OP_Home/rulings/di/01/SSR2016-03-di-01.html (last visited May 16, 2019). Thus, it applies here. Although the new ruling eliminates the term "credibility" and focuses on "consistency" instead, much of the relevant case law refers to credibility. But as the Ninth Circuit has clarified, SSR 16-3p

makes clear what our precedent already required: that assessments of an individual's testimony by an ALJ are

8

presented objective medical evidence of an underlying impairment

[that] could reasonably be expected to produce the pain or other

symptoms alleged." Lingenfelter, 504 F.3d at 1036 (citation

omitted). If such objective medical evidence exists, the ALJ may

not reject a claimant's testimony "simply because there is no

showing that the impairment can reasonably produce the degree of

symptom alleged." Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir.

1996) (emphasis in original), superseded in part by statute on

other grounds,

§ 404.1529.

　　　　If the claimant meets the first test, the ALJ may discount

the claimant's subjective symptom testimony only if he makes

specific findings that support the conclusion. See Berry v.

Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010). Absent a finding or

affirmative evidence of malingering, the ALJ must provide a

"clear and convincing" reason for rejecting the claimant's

testimony. Brown-Hunter v. Colvin, 806 F.3d 487, 493 (9th Cir.

2015) (as amended) (citing Lingenfelter, 504 F.3d at 1036);

Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1102 (9th

Cir. 2014). If the ALJ's evaluation of a plaintiff's alleged

symptoms is supported by substantial evidence in the record, the

reviewing court "may not engage in second-guessing." Thomas v.

---

designed to "evaluate the intensity and persistence of symptoms after [the ALJ] find[s] that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms," and not to delve into wide-ranging scrutiny of the claimant's character and apparent truthfulness.

Trevizo v. Berryhill, 871 F.3d 664, 678 n.5 (9th Cir. 2017) (as amended) (alterations in original) (quoting SSR 16-3p).

_Barnhart_, 278 F.3d 947, 959 (9th Cir. 2002).

Inconsistency with evidence in the medical record is a "sufficient basis" for rejecting a claimant's subjective symptom testimony. _Carmickle v. Comm'r, Soc. Sec. Admin._, 533 F.3d 1155, 1161 (9th Cir. 2008); _see also_ _Morgan v. Comm'r of Soc. Sec. Admin._, 169 F.3d 595, 600 (9th Cir. 1999) (upholding "conflict between [plaintiff's] testimony of subjective complaints and the objective medical evidence in the record" as "specific and substantial" reason undermining statements). But it "cannot form the sole basis for discounting pain testimony." _Burch v. Barnhart_, 400 F.3d 676, 681 (9th Cir. 2005); _Rollins v. Massanari_, 261 F.3d 853, 857 (9th Cir. 2001) (citing then-current version of § 404.1529(c)(2)).

2.  Relevant background

a.  _Plaintiff's statements_

In a February 2014 report, Plaintiff marked that she was feeling "[w]orse" since her last doctor's appointment and had recently gone to the emergency room "for nerve damage." (AR 712.) She had "[j]oint pain/swelling," "[n]umbness/tingling," and "[d]ifficulty walking." (_Id._)

In a July 2014 function report, Plaintiff wrote that she was "in constant pain that makes it hard . . . to move around." (AR 215.) She had "shoulder pain, neck pain, low back, knee pain and hip pain constantly" and couldn't "push, pull, bend, lift or reach overhead." (_Id._) On an average day, she would brush her teeth, shower, and make herself something to eat but otherwise would "lay down or sit down and watch TV." (AR 216.) She specified that she made "sandwiches, frozen dinners, microwavable

dinners or rice and chicken" and spent "5 to 15 min[utes]"
cooking, with "breaks in between."  (AR 217.)

Plaintiff reported that she struggled to sleep because it
was "hard" to "get comfortable," and she woke up "throughout the
night" because "the pain [was] so intense."  (AR 216.)  She had
difficulty dressing herself, writing that "it[']s hard for me to
bend down and put my underwear on or my pants, put on my socks[,]
my shoes" and "my bra and my shirt."  (Id.)  Personal grooming
was also a challenge: she had "trouble scrubbing [her] body and
washing [her] hair," "shaving," and "sitting down and getting up"
from the toilet.  (Id.)  She did not do chores because of "the
pain" and had to have someone help with her laundry "every two
weeks."  (AR 217.)  She went outside "once in awhile" when she
"need[ed] to," and she could "go out alone" and drive.  (AR 218.)
She shopped "once a month" for "30 min[utes] or so" for "hygiene
products" and groceries.  (Id.)  Her only hobby was watching TV;
she noted that before getting hurt, she "hardly watch[ed] TV" but
did so now because of her "constant pain" and inability to do
anything else.  (AR 219.)  Every two weeks, she spent time "with
others," and they would "talk, watch movies or help me with the
thing[s] I need help with" and "have dinner."  (Id.)[7]  She didn't
go out socially.  (AR 219-20.)

In a check-the-box portion of the report, Plaintiff marked
that she had trouble lifting, squatting, bending, standing,

_____

[7] A friend filled out a third-party function report and
wrote that she "or someone else" would "come and help
[Plaintiff]" "about every 2 weeks."  (AR 226; see also AR 228
("We watch TV and movies and I help her with things she need
[sic] and hang out and talk.").)

reaching, walking, sitting, kneeling, stair-climbing, and completing tasks. (AR 220.) She couldn't lift more than 10 pounds[8] and needed to rest for "15-30 min[utes]" after "less th[a]n half a block" of walking. (Id.) When "moving around," she used a "cane and [b]race," which were prescribed by a doctor. (AR 221; see also AR 899.)

On November 3, 2014, Plaintiff filled out a form, indicating that she felt the "[s]ame" since her last doctor's visit and still experienced "[w]eakness" in her back, knee, and hip; "[n]umbness" in her foot and knee; "[l]ocking" in her hip, back, and knee; and "[s]welling" in her back and knee. (AR 895.) Her pain was "aggravated with" overhead reaching, lifting, pushing, pulling, twisting, bending, stooping, kneeling, walking, and sitting. (Id.)

In an undated disability-report update, Plaintiff wrote that since August 2014, her left knee had "worsen[ed]" and she would "be having knee surgery in the near future." (AR 241.) Her hip was "not better" and had a "pinch."[9]  (Id.) Her shoulder had also "worsen[ed]." (Id.) Since July 2014, she was feeling "more depress[ed]," her anxiety had "worsen[ed]," and she was suffering "[p]anic attacks" and having "trouble sleep[i]ng at night." (Id.) In another undated update, she wrote that since September 2014, her knee and hip had "worsen[ed]" and her "surgeon

---

[8] Plaintiff actually wrote, "I can't lift less th[a]n 10 pounds with the back and shoulder knee hip [sic] pain," but she most likely intended to write that she couldn't lift "more" than that amount. (AR 220.)

[9] Plaintiff had hip surgery on August 21, 2014. (See AR 764.)

requested a second surgery for both body parts." (AR 250.) Her hip "constantly" locked, and the knee and hip pain made it "hard . . . to walk, sleep and move around." (Id.)[10] Her "depression, anxiety and lower back ha[d also] worsen[ed]." (Id.) She was "[w]aiting on surgery" and getting tests, injections, and medication in the interim. (AR 252.)

At the January 10, 2017 hearing, Plaintiff testified that she had "knee pain," "severe nerve damage on both . . . legs," "bone on bone grinding" in her knee,[11] "severe pain through [her] groin into [her] hip," back pain, neck pain, right-shoulder pain, and numbness and tingling in her "hand."[12] (AR 48.) She explained that a disc in her back "collapsed" and that "[t]hey're saying that I need back surgery." (Id.; see also AR 54 (reiterating that "they just want to focus on the back now, because it has completely collapsed, my bone").)[13] She asserted that "they don't want to touch [my hip], because I'm too young also for a hip replacement." (AR 54.)

---

[10] Plaintiff indicated that an MRI on February 6, 2015, showed that her hip was "deter[ior]ating" (AR 250), but no such MRI appears in the record.

[11] She did not specify which knee, but she likely meant her left. (See, e.g., AR 63.)

[12] Plaintiff later clarified that her right hand was the one with "numbness and tingling," explaining that although she is right-handed, she used her left hand more "because my [right] hand's always numb." (AR 51.)

[13] The record includes a lumbar MRI from June 2016 showing "[s]evere loss of disc height and disc dessication" at "L4-5" (see AR 1029-30) but does not include any doctor's notes recommending back surgery. Although Defendant writes that "doctors recommended spinal fusion" for Plaintiff (J. Stip. at 26), the pages she cites in support of that concession do not support it.

Plaintiff testified that "it hurts to sit" and "stand" and "even hurts to lay down." (AR 49.) She could sit at "most . . . about 15 to 20 minutes" before experiencing pain in her legs, back, and hip. (Id.) She felt a "constant pinch between my shoulder and my arm and my neck from sitting" or "even standing." (Id.) Her feet swelled so much "to the point where I can't even put on shoes sometimes." (Id.) She could stand for "about 15, 20 minutes" but noted that "[i]t's very painful" and repeated that her doctor said she needed back surgery "to take out the disc, take a piece of my bone, fuse it to the back of my bone and then put on screws." (AR 50.) She used her cane "at all times" (id.), including when going to the bathroom, "because it's hard for me to . . . stand up and sit down" (AR 51), although she also said that she used the cane at home "depending [on] what [she was] doing" (id.). She had had "two knee surgeries" already and said that "[t]hey say I need a knee replacement." (AR 54.) She estimated that she could walk "about ten minutes maybe" but tried not to walk at all. (Id.) She spent "a lot" of time in bed, estimating "about eight hours, nine" total during the day. (AR 52.) She could not work because "[t]he repetitive stooping, bending, standing, sitting, writing is very painful." (AR 54.)

Plaintiff's niece sometimes visited and helped her get food; "sometimes she'll even go to the grocery store or have somebody help me or drive me." (AR 52.) Plaintiff was able to drive but "hardly" did so because of the numbness in her hand and pinching in her back. (AR 53.) She lived with her sister's ex-boyfriend and his kids. (Id.) She "hardly" cooked, relying on food she could microwave. (Id.)

Plaintiff said she had "really bad anxiety" and "depression" (AR 49) and felt "sad" because she didn't see how she would be able to recover, work, or have children (AR 55).

b. *Plaintiff's treatment records*[14]

In February 2014, as part of his ongoing progress reports for Plaintiff's workers'-compensation case, orthopedic surgeon Thomas Phillips noted that his objective findings were "unchanged," presumably from December 2013 notes indicating left-knee and right-shoulder "derangement" and some positive impingement results. (AR 696-97, 700; see also AR 685.) He found evidence of a "labral tear" in the left hip and a medial meniscus tear in the left knee (AR 700, 706)[15] and diagnosed her with right-shoulder derangement,[16] lumbar myalgia, lumbar myospasm, lumbar neuritis/radiculitis, lumbar sprain/strain, left-hip labral tear, left-knee derangement, and left-knee medial meniscus tear. (AR 707.) He referred her to a "hip arthroscopy surgeon for [left] hip arthroscopy" and requested authorization for "narcotic medication management." (AR 700, 707.) He prescribed Norco[17] and Flexeril.[18] (AR 703, 707.)

---

[14] Plaintiff's history of injuries and treatment began in 2005 (see, e.g., AR 374, 408-29 (summarizing her treatment history)), but because her alleged onset date is January 8, 2014 (AR 175), only records after then are considered here.

[15] An arthrogram of Plaintiff's left knee conducted on January 21, 2014, showed a medial meniscus tear, cartilage thinning, and "[m]ild degenerative bone changes." (AR 927.)

[16] An arthrogram of Plaintiff's right shoulder conducted on January 22, 2014, showed "[p]ostsurgical defects . . . in the humeral head" but otherwise unremarkable results. (AR 928-29.)

[17] Norco is brand-name hydrocodone-acetaminophen. See Norco, WebMD, https://www.webmd.com/drugs/2/drug-63/norco-oral/

At an appointment later that month, Dr. Phillips noted that Plaintiff had recently gone to the emergency room for numbness and tingling in both hands and "burning pain" down both legs. (AR 710.) He observed that she had decreased sensation in her feet. (Id.) He referred her for narcotic medication management (id.) and prescribed Medrol[19] (AR 713).

In March 2014, Dr. Phillips again referred Plaintiff to a "hip arthroscopy surgeon" and "pain management . . . for narcotic med[ical] management." (AR 720.) He also prescribed a lumbar-spine brace, left-knee brace, and TENS unit. (AR 721.) His April 2014 notes indicated that her condition was "unchanged." (AR 725.) Her lumbar range of motion "was restricted due to pain and spasm," and "there was tenderness to palpation, guarding and spasm." (AR 730.) Her left hip also had "tenderness to palpation" and "restricted" range of motion "due to pain." (Id.) Her left knee had "tenderness to palpation . . . over the joint line," but range of motion was "normal." (AR 731.) He prescribed tramadol,[20] "recommend[ed] her to proceed with hip

details (last visited May 16, 2019).

[18] Flexeril (which has the generic name cyclobenzaprine) is a muscle relaxant used short term to treat muscle spasms. See Flexeril Tablet, WebMD, https://www.webmd.com/drugs/2/drug-11372/flexeril-oral/details (last visited May 16, 2019).

[19] Medrol is a corticosteroid hormone that decreases the immune system's responses to various disorders and diseases. See Medrol, WebMD, https://www.webmd.com/drugs/2/drug-11321/medrol-pak-oral/details (last visited May 16, 2019).

[20] Tramadol helps relieve moderate to moderately severe pain. See Tramadol HCL, WebMD, https://www.webmd.com/drugs/2/drug-4398-5239/tramadol-oral/tramadol-oral/details (last visited May 16, 2019). It is "similar to opioid (narcotic) analgesics." Id.

surgeon and pain management," and again "request[ed] an
authorization for lumbar spine brace, left knee brace and TENS
unit." (AR 732.) His May 2014 notes are largely the same. (<u>See</u>
AR 735.)

On June 18, 2014, Plaintiff met with Dr. Justin Saliman, an
orthopedic surgeon, for her left-hip pain. (AR 753.) He
observed a "[p]ositive labral stress test," "[p]ositive pain on
hip flexion with internal rotation," and some "mild" "tenderness
to palpation." (<u>Id.</u>) On June 20, 2014, Plaintiff had a pelvic
x-ray that showed signs of "chronic labral degeneration" and
possible predisposition to "impingement" in her left hip. (AR
751-52.)

In July 2014, Dr. Phillips noted that "pain management" was
"approved" and Plaintiff could now "schedule and proceed." (AR
755.) She was still awaiting authorization for the lumbar-spine
brace, left-knee brace, TENS unit, and hip surgery. (<u>Id.</u>)

On August 11, 2014, Plaintiff met with pain specialist Dr.
Rohini Patel. (AR 826.) He observed "tender lumbar para[spinal]
and sacroiliac area," "[d]ecreased range of motion" in the lumbar
spine, and an "antalgic" gait. (<u>Id.</u>) The rest of the physical
examination yielded normal results (<u>id.</u>), but a nerve conduction
study showed "evidence of left L5-S1 radiculopathy" (AR 828). On
August 14, 2014, she saw pain specialist Dr. Jonathan Kohan for
an initial consultation. (AR 930.) He found "tenderness to
palpation over paravertebral, trapezius, deltoid, and rhomboids
area with moderate spasm" as well as "tenderness over paraspinous
muscles." (AR 935.) Range of motion in her shoulder was normal,
but he observed "tenderness." (AR 936.) Her gait was

"antalgic," but she could "ambulate without a cane" and "perform
toe and heel walk with pain in the back." (AR 937.) He found
evidence of pain and spasm in her lumbar spine, but her straight-
leg-raise tests[21] were negative bilaterally. (Id.) Her left
knee was positive for tenderness and the McMurray test.[22] (AR
938.) He noted that Dr. Phillips's office had prescribed a
regimen of "tramadol, ibuprofen creams and Flexeril[,] which have
been beneficial partial and temporary." (AR 940.) He suggested
that an epidural injection for the "low back and lower extremity
symptoms" might be helpful but decided to see how she fared with
medication for the next month. (Id.)

On August 21, 2014, Plaintiff underwent arthroscopic hip
surgery for "femoroplasty,"[23] "[a]cetabuloplasty,"[24] "[l]abral
repair,"[25] and "[s]ynovectomy."[26] (AR 764.) While doing the

---

[21] A straight-leg-raise test checks the mechanical movement
of neurological tissues and their sensitivity to stress and
compression when disc herniation is suspected. See Straight Leg
Raise Test, Physiopedia, https://www.physio-pedia.com/
Straight_Leg_Raise_Test (last visited May 16, 2019).

[22] A McMurray test detects internal tears in the knee joint.
See Diagnosing Knee Injury with a McMurray Test, verywellhealth,
https://www.verywellhealth.com/mcmurray-test-2549599 (last
updated Dec. 1, 2018).

[23] Femoroplasty is the removal of bony irregularities from
and reshaping of the femur. See Femoroplasty, Wiktionary,
https://en.wiktionary.org/wiki/femoroplasty (last updated Jan. 3,
2019).

[24] Acetabuloplasty is a surgical procedure to correct
dislocation of the hip. See Acetabuloplasty, Encylopedia.com,
https://www.encyclopedia.com/caregiving/dictionaries-thesauruses-
pictures-and-press-releases/acetabuloplasty (last visited May 16,
2019).

[25] Surgical labral repair involves repairing or removing the
torn part of the labrum. See Hip Labral Repair, Mayo Clinic,

procedures Dr. Saliman found evidence of "CAM impingement,"
bruising, "extensive synovitis," "pincer impingement," and "an
impinging transition zone between the femoral head and neck."
(Id.)  He remarked that her hip issues had previously been
"resistant to conservative treatment modalities."  (Id.)

At a follow-up appointment on September 3, 2014, Plaintiff
reported "mild foot numbness" and said that she "fell twice since
surgery."  (AR 819.)  She began physical therapy around the same
time.  (See AR 820.)

On September 4, 2014, Dr. Kohan filled out a progress report
for Plaintiff and prescribed Norco.  (AR 921.)  She apparently
reported "improved functional capacity with activities of daily
living, self grooming, and chores around the house."  (Id.)  On
September 12, 2014, Dr. Kohan noted that Norco had not been
provided for some reason, and he resubmitted a request for Norco
and Zanaflex[27] to be taken twice a day.  (AR 924.)  He reported
that "multiple orthopedic complaints increased dramatically after
she was not provided with the recommended medication" (AR 923)

https://www.mayoclinic.org/diseases-conditions/hip-labral-tear/
diagnosis-treatment/drc-20354878 (last updated Mar. 7, 2018).

[26] Synovectomy is the removal of inflamed joint tissue that
can cause pain and limit functionality.  See Synovectomy for
Rheumatoid Arthritis, Univ. Wis. Health, https://
www.uwhealth.org/health/topic/surgicaldetail/synovectomy-for-
rheumatoid-arthritis/aa18893.html (last updated June 10, 2018).

[27] Zanaflex treats muscle spasms.  See Zanaflex, WebMD,
https://www.webmd.com/drugs/2/drug-14706/zanaflex-oral/details
(last visited May 16, 2019).

and flagged that ibuprofen, tramadol, gabapentin,[28] and Flexeril had all failed to help.  (AR 923-24).  He observed that her gait was "antalgic severely" and that she required crutches for ambulation.  (AR 924.)

On October 2, 2014, Dr. Kohan determined that Plaintiff met "criteria . . . for lumbar epidural injections."  (AR 918.)  In the meantime, she was "awaiting authorization for all the medications we requested," "maintained currently" on Norco, Zanaflex, and Fiorinal,[29] and was doing "physical therapy for the left hip."  (Id.)  Physical examination revealed "spasm and tenderness of the paravertebral muscles of the cervical and lumbar spines with decreased range of motion in flexion and extension."  (Id.)  He observed "[d]iscomfort" when he was examining her left hip and knee.  (AR 919.)  He concluded that "[m]edications are addressing her nociceptive pain[30] adequately" but that the "clinical impression, co[rro]brating diagnostic studies, and failure to improve with conservative treatment provide[d] substantial medical evidence" and justification for "lumbar epidural injection at level L5-S1."  (Id.)

---

[28] Gabapentin is an anticonvulsant used sometimes to relieve nerve pain.  See Gabapentin, WebMD, https://www.webmd.com/ drugs/2/drug-14208-8217/gabapentin-oral/gabapentin-oral/details (last visited May 16, 2019).

[29] Fiorinal is combination butalbital, aspirin, and caffeine, and it treats tension headaches.  See Fiorinal, WebMD, https://www.webmd.com/drugs/2/drug-15819/fiorinal-oral/details (last visited May 16, 2019).

[30] Nociceptive pain refers to pain from physical damage to the body, as opposed to neuropathic pain, which is caused by nerve damage.  See Nociceptive and neuropathic pain: What are they?, MedicalNewsToday, https://www.medicalnewstoday.com/ articles/319895.php (last updated Nov. 2, 2017).

At an October 6, 2014 appointment, Dr. Phillips observed that Plaintiff's leg pain was "unchanged" and that knee surgery was "pending" for "after hip recovery." (AR 799.) On October 15, 2014, she reported to her hip surgeon, Dr. Saliman, that she had a "50% pain reduction from her pre-surgical state." (AR 779.) The physical exam, however, revealed a "[m]oderate labral stress test," "[p]ositive pain on hip flexion with internal rotation," and "severe . . . tenderness to palpation." (<u>Id.</u>) He ordered a cortisone "XRAY [f]luoroscopy [g]uided [t]herapeutic [i]njection." (AR 822, 824; <u>see also</u> AR 823.) On October 21, 2014, a representative for Dr. Phillips wrote that Plaintiff would likely be able to return to modified work on November 3, 2014, pending treatment records from her hip surgeon and continued pain management. (AR 820.)

On November 3, 2014, Dr. Phillips noted that Plaintiff recently went to the ER and was going to have a "[h]ip injection" the next day. (AR 893.) Her range of motion "was restricted due to pain and spasm," and "[t]here were trigger points noticeable in the lumbar paraspinal muscles bilaterally." (AR 898.) Her range of motion in the left knee was "normal," but "there was tenderness to palpation . . . over the joint line." (<u>Id.</u>) He requested authorization for a cane and a TENS unit; braces for her knee and lumbar spine had already been "dispensed." (AR 899-900.) He wrote that "left knee surgery might be considered after hip treatment" and that she was "temporarily totally disabled."[31]

---

[31] The ALJ rejected the finding that Plaintiff was temporarily totally disabled (AR 900) but seemed to accept Dr. Phillips's "clinical findings," noting that they were "consistent with a conclusion that the claimant could do work with the

(AR 900.)  On December 15, 2014, Dr. Phillips noted that left-knee surgery was "[l]ikely" and that his objective findings were "unchanged."  (AR 903.)  Plaintiff reported that she was doing physical therapy but felt the "[s]ame."  (AR 905.)

On November 19, 2014, Dr. Kohan "formally appeal[ed] the denial" for a lumbar epidural steroid injection, arguing among other things that Plaintiff had "lower back pain radiating into the left lower extremity with numbness and weakness," "difficulty with bending, stooping, squatting, and prolonged standing and walking," "decreased sensation with pain over the left L5 and S1 dermatomes," and "weakness with toe and heel walking on the left side as well as discomfort with flexion and extension of the left knee against gravity."  (AR 915-16.)  He noted that she had "attempted extensive conservative management including medications and therapy but remain[ed] considerably symptomatic."  (AR 916.)  On December 11, 2014, Dr. Kohan observed that Plaintiff was "visibly uncomfortable," with "[s]pasm and tenderness" and "[d]ecreased sensation with pain."  (AR 912.)  He diagnosed her with "[a]cute flare-up of myofascial pain of cervical and lumbar spines" and "[c]ervical sprain/strain."  (Id.)  He again "appealed a denied lumbar epidural injection" (id.), arguing that she was "suffering from chronic pain" and was "not on a heavy opioid regimen" (AR 913).  He injected her back in two places with lidocaine.[32]  (Id.)

_____

limitations noted herein" (AR 35).

[32] Lidocaine is an anesthetic used to help reduce pain.  See lidocaine injection, Michigan Medicine, https://www.uofmhealth.org/health-library/d00059v1 (last visited May 16, 2019).

On January 8, 2015, Plaintiff complained to Dr. Kohan that her "low back and leg ha[d] only worsened, even though she had some improvement" after the injections. (AR 910.) He continued to "appeal[] the determination that resulted in denial of her lumbar epidural" (id.) and was also "trying to appeal" an apparent reduction in her medication (AR 911). He reiterated that "[s]he remains a candidate to undergo epidural steroid injection to the lumbar spine area, as all other modes of treatment have failed and . . . complaints and physical exam findings continue to be consistent with her MRI findings and examination." (Id.)

On January 16, 2015, Plaintiff saw Dr. Kohan again. (AR 907.) She was "still awaiting . . . the recommended epidural injection." (Id.) She was taking Norco and Zanaflex daily and Fiorinal "occasionally . . . to address her chronic back pain and headaches." (Id.) She reported that her pain was a "9/10 without use of any medication." (Id.) She "recently underwent injection" of her left hip, and it was "beneficial." (AR 907-08.) The doctor continued to recommend "epidural steroid injection" and reiterated that "this has already been submitted for review on two occasions" and "[s]he will be scheduled if she is authorized." (AR 908.)

On March 18, 2015, Plaintiff saw orthopedic surgeon Lee Silver for her workers'-compensation case. (AR 975.) He observed "diffuse tenderness" in the neck but "no paravertebral spasm, guarding, or asymmetric range of motion." (AR 977.) Her back had "diffuse" tenderness and "significant paravertebral spasm, guarding, and asymmetric range of motion." (Id.) Her

right shoulder had "impingement." (AR 979.) Plaintiff reported to Dr. Silver that her hip surgery "did not benefit her." (AR 980.) He "restricted [her] from repetitive work with the right upper extremity above the shoulder level," "repetitive squatting, climbing, kneeling, bending and stooping," lifting "greater than 20 pounds," and "running and jumping." (AR 980-81.)[33] Dr. Silver filed two supplemental updates after this examination (see AR 967-73 (reports dated May and Sept. 2015 including review of materials only)), but the record does not include any treatment records from anyone between March 18, 2015, and June 9, 2016.[34]

On June 9, 2016, Plaintiff underwent an MRI of her lumbar spine, which showed "[d]egenerative disc changes at L4-5 and L5-S1 with mild facet arthropathy," "[m]ild spinal canal narrowing at L4-5 associated with broad-based disc bulge," "[m]oderate spinal canal narrowing at L5-S1 associated with broad-based disc bulge," and "annular tears in the posterior intervertebral dis[c]s at these levels." (AR 1030.)

---

[33] The ALJ gave "great weight" to Dr. Silver's opinion, finding that the "functional limitations" he assessed were "consistent with the claimant's residual functional capacity and . . . supported by the positive objective findings noted during his examination of the claimant." (AR 35.)

[34] Dr. Silver wrote that he reviewed a progress report from Dr. Phillips dated March 9, 2015, but it does not appear in the record. (See AR 972.) Dr. Phillips apparently recommended continued follow-up with "conservative measures" and noted that "approval [was] needed for an arthroscopic left knee medial meniscus surgery." (Id.)

c.  *The ALJ's findings relating to Plaintiff's*
*subjective symptom statements*

The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to provide [her] alleged symptoms," but her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (AR 31.) He gave her the benefit of the doubt, however, by imposing greater limits in her RFC than those assessed by the state-agency medical consultants. (See AR 34.)

The ALJ pointed to Plaintiff's activities of daily living to justify partially discounting her subjective symptom statements and testimony. (AR 30.) He noted at step three that Plaintiff had "mild restriction" in "activities of daily living" and engaged in "personal grooming activities, prepared simple meals, assisted with laundry, could go places alone, could drive a vehicle and occasionally shopped." (AR 27.) He repeated this list of activities in his discussion of her subjective symptoms (see AR 30) but also acknowledged her testimony that "she spent approximately eight hours a day laying down," "rarely drove," "microwaved meals," and "experienced difficulty with dressing, bathing, caring for her hair, shaving and using the restroom" (AR 29). He determined that "[a]lthough [her] activities of daily living were somewhat limited, some of the physical and mental abilities and social interactions required in order to perform these activities are the same as those necessary for obtaining and maintaining employment." (AR 30.)

The ALJ also found that "[t]he treatment records reveal

[she] received routine, conservative, and non-emergency treatment since the alleged onset date." (AR 31.) He did not specify which treatments he considered to be conservative or routine and instead provided a summary of her test results and the opinions of several doctors. (See generally AR 31-35.)

### 3. Analysis

The ALJ gave three reasons for partially discounting Plaintiff's subjective pain testimony: inconsistency with the objective medical evidence, inconsistency with activities of daily living, and conservative treatment. (See generally AR 29-31.) But her activities of daily living were not inconsistent with her subjective statements, her treatment was not conservative or routine, and inconsistency with objective medical evidence is an insufficient reason on its own. See Burch, 400 F.3d at 681. Accordingly, the ALJ erred.

### a. *Activities of daily living*

The ALJ found that Plaintiff's activities of daily living were inconsistent with the alleged degree of her physical limitations. (See AR 30; see also AR 27.) An ALJ may discount a claimant's subjective symptom testimony when it is inconsistent with her daily activities. See Molina, 674 F.3d at 1113. "Even where those [daily] activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." Id.

The ALJ concluded that because Plaintiff engaged in "personal grooming activities, prepared simple meals, assisted with laundry, could go places alone, could drive a vehicle and

occasionally shopped" (AR 27), she was only "somewhat limited" (AR 30). But Plaintiff clearly expressed that she had difficulty with personal grooming (see, e.g., AR 51, 216), needed a friend to help her with laundry and chores (see, e.g., AR 217), and relied on others to help her shop for necessities (see AR 52-53). Her testimony and function report consistently indicated that she struggled to go out at all. (See, e.g., AR 53 (testifying that she "hardly" drove because of numbness in her hand and pinching in her back and that "most of the time somebody drives me"), 218 (she went out "once a month" for "hygiene products" and groceries), 219 (friend came over every two weeks to help with chores and keep her company), 220 (she didn't go out to social events)). Nothing in the record contradicted Plaintiff's testimony and statements on these points; indeed, the ALJ seemed to accept them but did not take into account the limited extent to which Plaintiff could do the activities on her own.

Moreover, the ALJ failed to explain how Plaintiff's ability to do activities like shopping once a month and microwaving meals would translate to a work environment. See Trevizo v. Berryhill, 871 F.3d 664, 682 (9th Cir. 2017) (as amended) ("[M]any home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication." (citation omitted)); Orn v. Astrue, 495 F.3d 625, 638 (9th Cir. 2007) ("The ALJ must make specific findings relating to the daily activities and their transferability to conclude that [they] warrant an adverse credibility determination." (citation omitted)).

The fact that Plaintiff could, with difficulty and breaks

for rest, partake in some basic activities and go out alone when necessary was not inconsistent with her claims that she could not work.  (See, e.g., AR 54 (testifying that she needed to lie down up to nine hours during day and couldn't work because "repetitive stooping, bending, standing, sitting, [and] writing [was] very painful").)  "[I]mpairments that . . . preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day."  Garrison v. Colvin, 759 F.3d 995, 1016 (9th Cir. 2014) (citation omitted) (holding that "ability to talk on the phone, prepare meals once or twice a day, occasionally clean one's room, and . . . care for one's daughter, all while taking frequent hours-long rests, avoiding any heavy lifting, and lying in bed" was "consistent with an inability to function in a workplace environment").

Accordingly, Plaintiff's daily activities were not a clear and convincing reason to discount her subjective symptom testimony and statements.

b. *Conservative treatment*

The ALJ also discounted Plaintiff's statements regarding her physical pain because "[t]he treatment records reveal the claimant received routine, conservative, and non-emergency treatment since the alleged onset date."  (AR 31.)  Conservative treatment is a "sufficient" reason to reject a claimant's subjective symptom testimony.  Parra, 481 F.3d at 751 (citation omitted).  But the ALJ failed to show that conservative treatment was a clear and convincing reason in this case.

The ALJ did not specify which treatments in the record were conservative or routine, nor did he suggest any possible

treatments that Plaintiff could have had but didn't receive. (See generally AR 31-33.) Such lack of specificity is not clear and convincing. See Moody v. Berryhill, No. 16-CV-03646-JSC, 2017 WL 3215353, at *13 (N.D. Cal. July 28, 2017) (reversing in part because ALJ "did not point to what 'conservative' treatment Plaintiff was receiving, nor did she explain what additional treatment Plaintiff was supposed to receive").

In any event, the ALJ erred by categorizing all of Plaintiff's treatment as conservative or routine. (AR 31.) Arthroscopic surgery is generally not considered conservative. See, e.g., Hernandez v. Colvin, No. CV 12-3320-SP., 2013 WL 1245978, at *8 & n.7 (C.D. Cal. Mar. 25, 2013) (finding that plaintiff's care "did not remain conservative" because doctor recommended arthroscopic shoulder surgery and plaintiff underwent surgery two days after ALJ decision).[35] Injections are also generally not considered conservative, at least not when the plaintiff has received numerous injections on a regular basis. See Christie v. Astrue, No. CV 10-3448-PJW., 2011 WL 4368189, at *4 (C.D. Cal. Sept. 16, 2011) (refusing to characterize injections, epidurals, and narcotic pain medication as

---

[35] In fact, the hip surgeon wrote that he performed the surgery because Plaintiff's issues were "resistant to conservative treatment." (AR 764.) And although the record indicates that the August 2014 left-hip surgery provided some relief (see, e.g., AR 825 (Plaintiff reporting "50% pain reduction from her pre-surgical state")), it also shows that any such relief was fleeting (see, e.g., AR 824 (cortisone injection in left hip in Oct. 2014), 907-08 (treating pain specialist noting in Jan. 2015 that Plaintiff "recently underwent [left-hip] injection"), 956 (consulting orthopedist finding "[r]ange of motion of the left hip is 50% of expected with a fair amount of pain" in Aug. 2016)).

"conservative"). Not only did Plaintiff receive hip and back injections (see, e.g., AR 824, 910, 913), but treating pain specialist Kohan also persistently sought approval for her to receive epidural injections (see, e.g., AR 908, 910-11, 913) and stronger and increased pain medications (see AR 910-11), arguing that "all other modes of treatment have failed" (AR 911; see also AR 924 (listing medications that had not been effective)). Dr. Kohan's ongoing treatment, including injections, narcotic medications, and many requests for epidural authorizations, was not conservative or routine. See Samaniego v. Astrue, No. EDCV 11-865 JC., 2012 WL 254030, at *4 (C.D. Cal. Jan. 27, 2012) (treatment not conservative when claimant was treated "on a continuing basis" with steroid and anesthetic "trigger point injections," occasional epidural injections, and narcotic medication and doctor recommended surgery).

Similarly, treating orthopedist Phillips repeatedly noted that Plaintiff's condition was "unchanged" despite physical therapy and pain medications. (See, e.g., AR 903); see also Hernandez, 2013 WL 1245978, at *7 (finding that when plaintiff "continued to experience pain" with medication, "pain was [not] controlled," and so "help[]" from medication "was not a clear and convincing reason to discount plaintiff's credibility"). He also twice remarked that Plaintiff had sought emergency-room care (see AR 710, 893), undermining the ALJ's statement that all of Plaintiff's treatment had been "non-emergency" (AR 31).[36]

Furthermore, several treating and examining doctors

_____

[36] The AR does not include records from these emergency-room visits, however.

30

suggested that further surgeries were likely.  (See, e.g., AR 903

(treating orthopedist noting in Dec. 2014 that left-knee surgery

was "likely" after her hip had healed sufficiently), 958

(consulting orthopedist remarking in 2016 that "claimant is

scheduled to have multiple surgeries").)  Although Defendant is

correct that no additional surgeries are documented in the record

(see J. Stip. at 27), the record suggests that certain aggressive

treatments had been delayed over the years because of insurance

issues, allowances for healing time, and concerns about

Plaintiff's age (see, e.g., AR 54, 700, 707, 799, 918).  Cf. Orn,

495 F.3d at 638 (noting that failure to seek treatment may be

basis for adverse credibility finding unless good reason exists

for not pursuing it); Hernandez, 2013 WL 1245978, at *8 (waiting

for insurance authorization is good reason).

     Thus, the ALJ erred by improperly assessing Plaintiff's

treatments as conservative and routine.

c.  <em>Inconsistency with medical evidence</em>

     The ALJ recounted the findings and opinions of several

doctors at length (see generally AR 30-35), but even if he was

justified in finding that the objective medical evidence was not

consistent with Plaintiff's subjective complaints, that alone is

not a sufficient reason to discount them.  See Burch, 400 F.3d at

680 ("[A]n ALJ may not reject a claimant's subjective complaints

based solely on a lack of medical evidence to fully corroborate

the alleged severity of pain."); Gama v. Colvin, 611 F. App'x

445, 446 (9th Cir. 2015) (when one reason ALJ gave for

discounting plaintiff's credibility was erroneous and "only

remaining reason . . . was a lack of objective medical evidence,"

31

"error was not harmless").

Because two of the three reasons the ALJ gave for discounting Plaintiff's subjective pain statements and testimony were not supported by substantial evidence and the other was insufficient by itself, remand is warranted.

B.   Remand for Further Proceedings Is Appropriate

When an ALJ errs, as here, the Court "ordinarily must remand . . . for further proceedings." Leon v. Berryhill, 880 F.3d 1041, 1045 (9th Cir. 2017) (as amended Jan. 25, 2018); see also Harman v. Apfel, 211 F.3d 1172, 1175-78 (9th Cir. 2000) (as amended).  The Court has discretion to do so or to award benefits under the "credit-as-true" rule.  Leon, 880 F.3d at 1045 (citation omitted).  "[A] direct award of benefits was intended as a rare and prophylactic exception to the ordinary remand rule[.]"  Id.  The "decision of whether to remand for further proceedings turns upon the likely utility of such proceedings," Harman, 211 F.3d at 1179, and when an "ALJ makes a legal error, but the record is uncertain and ambiguous, the proper approach is to remand the case to the agency," Leon, 880 F.3d at 1045 (citing Treichler, 775 F.3d at 1105).

Here, further administrative proceedings would serve the useful purpose of allowing the ALJ to give proper consideration to Plaintiff's subjective symptom testimony.  See Arredondo v. Colvin, No. CV 15-01927-RAO, 2016 WL 3902307, at *7 (C.D. Cal. July 18, 2016) (remand "rather than an award of benefits" appropriate when only valid reason ALJ gave for discounting plaintiff's subjective pain testimony was "lack of supporting objective evidence").  If the ALJ chooses to discount Plaintiff's

subjective symptoms on remand, he can then provide an adequate discussion of the reasons why. See Payan v. Colvin, 672 F. App'x 732, 733 (9th Cir. 2016). Because many doctors assessed that Plaintiff could work with limitations, as noted by the ALJ (see generally AR 30-35; see also J. Stip. at 27 (Defendant arguing same)), the Court has serious doubt as to whether Plaintiff was disabled during any or all of the relevant period. For this reason, too, remand is appropriate. See Garrison, 759 F.3d at 1021 (recognizing flexibility to remand for further proceedings when "record as a whole creates serious doubt that [plaintiff] is, in fact, disabled").

**VI. CONCLUSION**

Consistent with the foregoing and under sentence four of 42 U.S.C. § 405(g),[37] IT IS ORDERED that judgment be entered REVERSING the Commissioner's decision, GRANTING Plaintiff's request for remand, and REMANDING this action for further proceedings consistent with this memorandum decision.


DATED: May 29, 2019

_____
JEAN ROSENBLUTH
U.S. MAGISTRATE JUDGE

---

[37] That sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."